**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CENTER FOR BIO-ETHICAL REFORM,
INC.; GREGG CUNNINGHAM,
                    *Plaintiffs-Appellants,*

v.

CITY AND COUNTY OF HONOLULU;
PETER CARLISLE, in his official
capacity as the City and County of
Honolulu Prosecuting Attorney;
BOISSE P. CORREA, in his official
capacity as Chief of Police,
Honolulu Police Department,
successor to Lee D. Donohue,
                    *Defendants-Appellees.*

No. 04-17496

D.C. No.
CV-03-00154-DAE

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

Argued and Submitted
November 21, 2005—Honolulu, Hawaii

Filed May 23, 2006
Amended July 6, 2006

Before: Myron H. Bright,* M. Margaret McKeown, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge McKeown

*The Honorable Myron H. Bright, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

## SUMMARY

### Constitutional Rights/Freedom of Speech

The court of appeals affirmed a judgment of the district court. The court held that a city ordinance prohibiting aerial advertising, used to restrict an advocacy group from towing aerial banners over the city beaches, was not preempted by federal law, and passed constitutional scrutiny under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

Appellant the Center for Bio-Ethical Reform brought suit in district court in Hawaii against appellees the city and county of Honolulu, alleging that its ordinance prohibiting aerial advertising violated its right to free speech under the First Amendment and its right to Equal Protection under the Fourteenth Amendment and that federal law preempted the ordinance. The ordinance prohibited the Center from towing its aerial anti-abortion banners over the beaches of Honolulu. Honolulu enacted the ordinance to preserve the area's coastal and scenic visual beauty. The ordinance had an exception for the display of an identifying mark, trade name, trade insignia, or trademark on the exterior of an aircraft. The Center's preemption challenge was based on its certificate of authorization from the Federal Aviation Administration (FAA) authorizing aerial advertisement banner towing; the certificate contained a note stating that it did not constitute a waiver of any state law or local ordinance. The district court granted summary judgment in favor of Honolulu, ruling that the ordinance did not violate the Center's constitutional rights.

The Center appealed.

[1] Congress may implicitly preempt state law through a comprehensive regulatory scheme that occupies the entire field being regulated, leaving no room for state or local sup-

plementation. This form of preemption is known as "field preemption." Federal law may also preempt state law where state law is displaced in favor of an actual conflict with federal law. This form of preemption is known as "conflict preemption." **[2]** The Ninth Circuit has already upheld Honolulu's ordinance against a virtually identical federal preemption challenge, explaining that advertising is an area traditionally subject to regulation under the states' police power, and therefore it had to be presumed that federal law did not displace Honolulu's regulatory authority over advertising absent a clear statement of the federal intent to do so, either by Congress or by the FAA as Congress's delegate. However, no such presumption applied to the aerial ordinance. **[3]** The Ninth Circuit has also analyzed whether a FAA "certificate of waiver," which was similar to the Center's certificate, precluded the enforcement of the ordinance under principles of conflict preemption. If the federal law contemplates coexistence between federal and local regulatory schemes, conflict preemption does not come into play. The Center's certificate contained precisely such a provision, stating that the certificate did not constitute a waiver of any state law or local ordinance. **[4]** The court of appeals was bound by its previous no-preemption conclusion.

**[5]** For purposes of First Amendment analysis, public property fits into one of three main categories: (1) a public forum, (2) a designated public forum, or (3) a nonpublic forum. **[6]** Public fora are places that have traditionally been devoted to expressive activity, such as public parks and sidewalks. **[7]** Areas not traditionally or explicitly opened to expressive activity are deemed nonpublic fora. **[8]** A review of the history, purpose, and physical characteristics of Honolulu's airspace led to the conclusion that it was a nonpublic forum. The airspace did not fit the public forum category because it was not among those places that have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. **[9]** Nor

could the airspace be classified as a designated public forum, which is created only when the government has expressly dedicated the property for expressive conduct. The regulated airspace is the antithesis of an intentional opening of a nontraditional forum for public discourse. [10] It had to be concluded that the airspace was a nonpublic forum, in which an ordinance does not violate the First Amendment as long as it is (1) reasonable in light of the purpose served by the forum and (2) viewpoint neutral.

[11] The ordinance's prohibition against airborne signs or advertising devices was viewpoint free. The ordinance said nothing about the content of the signs or the views expressed and made no distinction between commercial signs and other displays. Nor did it distinguish between commercial speech or political speech. And, finally, the ordinance drew no lines by subject matter or by viewpoint. In short, the prohibition was entirely neutral. [12] The identifying mark exception differentiated only as to the medium used for the expression—i.e., identifying marks on aircraft versus towed banners—and not on the basis of any particular viewpoint. [13] The ordinance easily passed the hurdle of viewpoint neutrality.

[14] The reasonableness analysis focuses on whether the limitation is consistent with preserving the property for the purpose to which it is dedicated. [15] Regulation for purposes of preserving aesthetics and promoting safety falls within the legitimate and substantial interests of local governments. [16] The ordinance fulfilled several legitimate needs, including preserving the scenic beauty of Honolulu. [17] It had to be concluded that the ordinance was reasonable.

[18] Banner towing is neither a common means of speaking nor a distinct and traditionally important form of expression. [19] Even though the banner may be preferable in its communicative efficiency, there was little likelihood that the Center would be chilled in its efforts to spread its message to its intended audience through ample and adequate alternative

channels. **[20]** It had to be held that the ordinance did not violate the First Amendment.

**[21]** The viability of equal protection claims relating to expressive conduct is contingent upon the existence of a public forum. Only when rights of access associated with a public forum are improperly limited may a court conclude that a fundamental right is impinged. Because the airspace is a nonpublic forum, the Center had no claim to a fundamental right of access, and the ordinance had to only rationally further a legitimate state purpose. The ordinance met this minimal scrutiny. For these reasons, the ordinance passed constitutional scrutiny. The judgment of the district court had to be affirmed.

---

## COUNSEL

Robert J. Muise, Thomas More Law Center, Ann Arbor, Michigan, and Robert K. Matsumoto, Honolulu, Hawaii, for the appellants.

Carrie K.S. Okinaga, Corporation Counsel, Gordon D. Nelson, Deputy Corporation Counsel, and Jon M. Van Dyke, Special Deputy Corporation Counsel, Honolulu, Hawaii, for the appellees.

---

## ORDER

The Opinion filed on May 23, 2006, is amended as follows:

On slip Opinion page 5645, line 10 of footnote 1, insert the following text before the sentence that begins with "We note that Hawaii Revised Statute . . .": Neither did the district court abuse its discretion in denying the Center's request to amend its complaint. *See Flowers v. First Hawaiian Bank*, 295 F.3d

7428    CENTER FOR BIO-ETHICAL REFORM v. HONOLULU

966, 976 (9th Cir. 2002) ("We review for abuse of discretion the denial of leave to amend after a responsive pleading has been filed.").

On slip Opinion page 5646, line 32, beginning with the sentence "In *Skysign* we explained . . ." and ending on page 5647, line 4, with "*Id.* at 1115.", delete and replace with the following text: In *Skysign*, we explained that "advertising is an area traditionally subject to regulation under the states' police power, and we therefore presume that federal law does not displace Honolulu's regulatory authority over advertising absent a clear statement of the federal intent to do so, either by Congress or by the FAA as Congress's delegate. . . . However, no such presumption applies to section 40-6.1, the *aerial* signage ordinance, which rather than addressing advertising generally specifically targets for regulation 'an area where there has been a history of significant federal presence,' *i.e.*, navigable airspace." *Id.* at 1115-16 (citations omitted).

On slip Opinion page 5649, at the end of footnote 3, insert the following text: Consideration of these documents and after-enacted changes is best left to the district court, not to the court of appeals for initial analysis. There is good reason why we generally do not consider issues for the first time on appeal—the record has not been developed, the district court has not had an opportunity to consider the issue, and the parties' arguments are not developed against the district court decision.

With these amendments, the panel has voted to deny the petition for panel rehearing. Judges McKeown and Clifton vote to deny the petition for rehearing en banc and Judge Bright so recommends. The full court has been advised of the petition for rehearing and rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. *See* Fed. R. App. P. 35. The petition for panel rehearing and the petition for rehearing en banc are denied.

## OPINION

McKEOWN, Circuit Judge:

The City and County of Honolulu, Hawaii ("Honolulu"), has a long history of comprehensive regulatory oversight over its visual landscape, an effort designed to protect the area's unique and widely-renowned scenic resources. For example, in 1957, Honolulu was among the first municipalities to enact a comprehensive ordinance regulating signs, *see State v. Diamond Motors, Inc.*, 429 P.2d 825, 826 (Haw. 1967), and, in 1978, Honolulu first passed what later became Revised Ordinance of Honolulu § 40-6.1 (1996) ("the Ordinance"), which prohibits aerial advertising.

The question presented in this appeal is whether the Ordinance may be used to restrict an advocacy group from towing aerial banners over the beaches of Honolulu. To answer this question, we must first decide whether the Ordinance is preempted by federal law and, if not, whether it passes constitutional scrutiny under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Less than five years ago, we answered the preemption question in the negative. *Skysign Int'l, Inc. v. City and County of Honolulu*, 276 F.3d 1109 (9th Cir. 2002). Nothing presented in this appeal persuades us that we should depart from that precedent. As to the constitutional question, we hold that the Ordinance passes constitutional muster. The Ordinance is a reasonable and viewpoint neutral restriction on speech in a nonpublic forum, and the banner towing prohibited by the Ordinance is neither a historically important form of communication nor speech that has unique identifying attributes for which there is no practical substitute. We affirm the district court's grant of summary judgment in favor of Honolulu.

## BACKGROUND

Honolulu's aerial advertising Ordinance is part of a longstanding scheme aimed at regulating outdoor advertising in

order to protect the critical visual landscape that has made the area famous. The linkage between the scenic viewscapes and the economic well-being of Honolulu, including its tourist industry, is not disputed. As one witness aptly stated, "looking out to sea from Waikiki Beach without commercial or promotional interruption is as crucial to the Hawaii visitor's and resident's experience as is the uninterrupted viewing of the canyon for travelers to the Grand Canyon. . . . [F]ew things can damage the distinctive character of a scenic view faster than a large moving sign pulled through the center of the field of vision."

Given the importance of preserving the area's coastal and scenic visual beauty, and in an effort to prevent potentially dangerous aerial distractions for its coastal vehicle traffic, Honolulu enacted the Ordinance, which, with few exceptions, prohibits aerial advertising:

(a)  Except as allowed under subsection (b), no person shall use any type of aircraft or other self-propelled or buoyant airborne object to display in any manner or for any purpose whatsoever any sign or advertising device. For the purpose of this section, a "sign or advertising device" includes, but is not limited to, a poster, banner, writing, picture, painting, light, model, display, emblem, notice, illustration, insignia, symbol or any other form of advertising sign or device.

(b)  Exceptions.

(1)  Subsection (a) shall not prohibit the display of an identifying mark, trade name, trade insignia, or trademark on the exterior of an aircraft or self-propelled or buoyant airborne object if the displayed item is under the ownership or registration of the aircraft's or airborne object's owner.

(2)   Subsection (a) shall not prohibit the display of a sign or advertising device placed wholly and visible only within the interior of an aircraft or self-propelled or buoyant airborne object.

(3)   Subsection (a) shall not apply to the display of a sign or advertising device when placed on or attached to any ground, building, or structure and subject to regulation under Chapter 21 or 41. Such a sign or advertising device shall be permitted, prohibited, or otherwise regulated as provided under the applicable chapter.

Section 40-6.1.

The Center for Bio-Ethical Reform and its director Gregg Cunningham (collectively "the Center") challenge the Ordinance because it prevents the Center from carrying out its aerial advocacy campaign over Honolulu's beaches. The Center is a pro-life/anti-abortion advocacy group that hires airplanes to tow aerial banners over heavily populated areas. These banners are typically 100-feet-long and display graphic photographs of aborted fetuses. The Center has used this publicity technique in many states and has found it to be very effective in spreading its message.

Absent specific authorization, Federal Aviation Administration ("FAA") regulations prohibit operation of civilian aircraft over densely populated areas. 14 C.F.R. § 91.313(e). Consequently, prior to towing its banners, the Center obtained permission from the FAA in the form of a Certificate of Authorization ("Certificate"). The Certificate states that it authorizes "aerial advertisement banner towing," but contains a note stating that it "does not constitute a waiver of any State law or local ordinance." The Certificate grants authorization to tow banners in "the contiguous United States of America, Alaska, Hawaii, and Puerto Rico."

Upset that under the Ordinance it could not tow banners over Honolulu, the Center filed suit seeking declaratory and injunctive relief to prevent enforcement of the Ordinance. The Center alleged that the Ordinance violates its right to free speech under the First Amendment and its right to Equal Protection under the Fourteenth Amendment and that federal law preempts the Ordinance. The district court denied the Center's motion for preliminary injunction and we affirmed that ruling. *Center for Bio-Ethical Reform, Inc. v. City and County of Honolulu*, 84 F.App'x 779, 2003 WL 23096041 (9th Cir. 2003).

The Center and Honolulu then filed cross-motions for summary judgment and the district court granted summary judgment in favor of Honolulu. *Center for Bio-Ethical Reform, Inc. v. City and County of Honolulu*, 345 F. Supp. 2d 1123 (D. Haw. 2004).[1] The district court rejected the preemption argument and held that the Ordinance did not violate the Center's constitutional rights.

---

[1]The Center also claimed that Honolulu did not have jurisdiction to enforce the Ordinance above coastal waters outside the territorial boundaries of Honolulu. Because the Center's original complaint did not include any reference to this claim, the district court declined to address it. *Center for Bio-Ethical Reform*, 345 F. Supp. 2d at 1138-39. We likewise do not consider the merits of this claim because it does not fall within the "narrow and discretionary exceptions to the general rule against considering issues for the first time on appeal." *Alaska v. United States*, 201 F.3d 1154, 1163 (9th Cir. 2000) (quoting *Jovanovich v. United States*, 813 F.2d 1035, 1037 (9th Cir. 1987)). Neither did the district court abuse its discretion in denying the Center's request to amend its complaint. *See Flowers v. First Hawaiian Bank*, 295 F.3d 966, 976 (9th Cir. 2002) ("We review for abuse of discretion the denial of leave to amend after a responsive pleading has been filed. We note that Hawaii Revised Statute § 445-113 (2005) was recently amended to allow a county to regulate "outdoor advertising devices located in the airspace or waters beyond the boundaries of the county that are visible from any public highway, park, or other public place located within the county."

## ANALYSIS

## I. THE ORDINANCE IS NOT PREEMPTED BY FEDERAL LAW

[1] Within certain Constitutional limits and absent explicit language preempting state law, Congress may implicitly preempt state law through a comprehensive regulatory scheme that occupies the entire field being regulated, leaving no room for state or local supplementation:

> Absent explicit preemptive language, Congress' intent to supercede state law altogether may be found from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.

*Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 203-04 (1983) (quotation marks omitted); *see also Barber v. Hawaii*, 42 F.3d 1185, 1189 (9th Cir. 1994). This form of preemption is known as field preemption. Federal law may also preempt state law where state law is displaced in favor of an actual conflict with federal law. This form of preemption is known as conflict preemption:

> Even where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obsta-

cle to the accomplishment and execution of the full
purposes and objectives of Congress.

*Pac. Gas & Elec.*, 461 U.S. at 204 (quotation marks and cita-
tions omitted); *see also Barber*, 42 F.3d at 1189.

[2] The Center argues that Congress, via the FAA, occupies
the entire field of tow banner regulation, and further, that the
FAA Certificate impermissibly conflicts with the Ordinance.
The Ninth Circuit has already spoken on this issue, upholding
the Ordinance against a virtually identical federal preemption
challenge. *Skysign*, 276 F.3d 1109. In *Skysign*, we explained
that "advertising is an area traditionally subject to regulation
under the states' police power, and we therefore presume that
federal law does not displace Honolulu's regulatory authority
over advertising absent a clear statement of the federal intent
to do so, either by Congress or by the FAA as Congress's del-
egate. . . . However, no such presumption applies to section
40-6.1, the *aerial* signage ordinance, which rather than
addressing advertising generally specifically targets for regu-
lation 'an area where there has been a history of significant
federal presence,' *i.e.*, navigable airspace." *Id.* at 1115-16
(citations omitted). Neither Congress nor the FAA has "ex-
erted its statutory authority to a degree that warrants a holding
that it has preempted the entire field." *Id.* at 1116. Although
Congress has "left open the door for the FAA to do so through
the use of its authority to develop regulations for the use of
navigable airspace. . . . without some affirmative accompany-
ing indication, [the FAA regulatory scheme does not] compel
a conclusion that the agency has sought to occupy the field to
the full." *Id.*

[3] We also analyzed whether a FAA "certificate of waiv-
er," which is similar to the Certificate in this appeal, precludes
the enforcement of the Ordinance under principles of conflict
preemption. *Id.* at 1117. If the federal law "contemplates
coexistence between federal and local regulatory schemes,"
conflict preemption does not come into play. *Id.* The certifi-

cate of waiver in *Skysign* contemplated such a coexistence, as evidenced by a specific provision that provided: "[t]he [aircraft] operator, by exercising the privilege of this waiver, understands all local laws and ordinances relating to aerial signs, and accepts responsibility for all actions and consequences associated with such operations." *Id.* at 1117-18. The FAA Handbook, which is the same one analyzed in *Skysign* and in this appeal, suggests including "similar provisions in waivers for banner tow operations . . . that the certificate and its special provisions 'do not supersede any local, state, or city ordinance(s) prohibiting aerial advertising.' " *Id.* at 1118. The Center's Certificate contains precisely such a provision, stating that the Certificate "does not constitute a waiver of any State law or local ordinance."

In the face of compelling precedent to the contrary, the Center urges that *Skysign* is no longer controlling because after the case was decided, the FAA issued a notice on October 7, 2002, that proposed deletion of certain provisions of the FAA Handbook. FAA Notice N 8700.16. We give the notice no weight because it self-expired on October 7, 2003, without any change to the FAA Handbook. *See US West, Inc. v. United States,* 48 F.3d 1092, 1101 (9th Cir. 1994) (stating that " 'failed legislative proposals' and [accompanying] recommendations in committee reports . . . . [are not] sufficient evidence to suggest that there is any relevant congressional intent to which this court could defer."), *judgment vacated on other grounds,* 516 U.S. 1155 (1996). Thus, the substance of the proposed change in the FAA Handbook merits no review on our part. For the same reason, we have no occasion to analyze a letter from the FAA's Deputy Chief Counsel explaining the proposed changes.[2]

---

[2]The FAA's position on banner towing is difficult to divine. It is fair to say that its view covers the waterfront, or in this case, the airspace. In an amicus brief filed in *Skysign,* the agency took the position that federal law did not preempt local sign ordinances. *See Skysign,* 276 F.3d at 1117. In other opinion letters, the FAA took the opposite view. *See id.* at 1117 & 1118 n.6 (discussing various letters from FAA counsel and *Banner Adver., Inc. v. City of Boulder,* 868 P.2d 1077 (Colo. 1994)). And, to confuse matters further, the FAA letter offered in connection with the October 7, 2002 notice contains internally conflicting language.

[4] Because the FAA Handbook and regulations before us remain the same as they were in *Skysign* and the Center's Certificate contemplates the coexistence of local and federal law, we are bound by *Skysign*'s no preemption conclusion. *Skysign*, 276 F.3d at 1118 ("[W]e conclude that the application of Honolulu's ordinances does not impede the federal policy or purpose in issuing [the] Certificates of Waiver."). We recognize though, as we did in *Skysign*, that Congress itself, or through the FAA, may have the authority to completely occupy the field of banner towing or regulate it in such a way that could preempt the Ordinance. *See id.* at 1116. We need not decide that issue here, however, because in the present appeal, no such affirmative regulations justify federal preemption.[3] We now turn to the Center's claim that the Ordinance violates the First Amendment.

## II. THE ORDINANCE DOES NOT VIOLATE THE FIRST AMENDMENT

It is uncontested that the banner towing at issue is a form of speech protected under the First Amendment. The Center has a targeted message that it wishes to communicate. "But it is also well settled that the government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). To assess a First Amendment free speech claim,

---

[3]The Center requests that we take judicial notice of changes made to the FAA Handbook on December 17, 2004, and a revised Certificate issued to the Center on February 22, 2005, both of which went into effect after the district court's decision in November 2004. We deny the Center's request for judicial notice pursuant Federal Rule of Evidence 201 because these documents were not before the district court and their significance, if any, is not factored into the record on appeal. Consideration of these documents and after-enacted changes is best left to the district court, not to the court of appeals for initial analysis. There is good reason why we generally do not consider issues for the first time on appeal—the record has not been developed, the district court has not had an opportunity to consider the issue, and the parties' arguments are not developed against the district court decision.

"we first must 'identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic.' " *Preminger v. Principi*, 422 F.3d 815, 823 (9th Cir. 2005) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

## A. THE AIRSPACE IS A NONPUBLIC FORUM

[5] For purposes of First Amendment analysis, public property fits into one of three main categories: (1) a public forum, (2) a designated public forum, or (3) a nonpublic forum. *Preminger*, 422 F.3d at 823. Any public property that is neither a public nor a designated public forum is considered a nonpublic forum. *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999).

[6] Public fora are places "that have traditionally been devoted to expressive activity," such as public parks and sidewalks. *Preminger*, 422 F.3d at 823. "Content-based restrictions in public fora are justified only if they serve a compelling state interest that is narrowly tailored to the desired end." *Id.* This level of review is known as strict scrutiny. Designated public fora are nonpublic fora that the government affirmatively opens to expressive activity. *Id.* As with public fora, content-based restrictions on designated public fora must pass strict scrutiny. *Id.*

[7] Areas not traditionally or explicitly opened to expressive activity are deemed nonpublic fora, which are subject to a more lenient standard of scrutiny—restrictions on nonpublic fora need only be reasonable and viewpoint neutral. *Id.* Examples of nonpublic fora include airport terminals, *Lee*, 505 U.S. at 679, highway overpass fences, *Brown v. Cal. Dep. of Transp.*, 321 F.3d 1217, 1222 (9th Cir. 2003), and interstate rest stop areas (including perimeter walkways), *see Jacobsen v. Bonine*, 123 F.3d 1272, 1273-74 (9th Cir. 1997).

**[8]** A review of the history, purpose, and physical characteristics of the airspace at issue leads us to conclude that it is a nonpublic forum. As to its history and purpose, the airspace does not fit the public forum category because it is not among those places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Lee*, 505 U.S. at 679. "[A] traditional public forum is property that has as 'a principal purpose . . . the free exchange of ideas.' " *Id.* (alteration in original) (quoting *Cornelius*, 473 U.S. at 800).

Like the airport terminal in *Lee*, the highway overpass fences in *Brown*, and the interstate rest stops in *Jacobsen*, the use of the airspace for banner towing is a relatively modern creation that "hardly qualifies for the description of having 'immemorially . . . time out of mind' been held in the public trust and used for purposes of expressive activity." *Lee*, 505 U.S. at 680. In fact, one would be hard pressed to find another forum that has had its access as historically restricted as U.S. airspace. The FAA has strict regulations governing the airspace and for more than twenty-five years Honolulu has regulated aerial advertising. In light of the numerous restrictions placed on the use of the airspace in and around Honolulu, its principal purpose can hardly be characterized as "promoting 'the free exchange of ideas.' " *Id.* at 682; *see United States v. Kokinda*, 497 U.S. 720, 727 (1990) (contrasting a public street, which is "a necessary conduit in the daily affairs of a locality's citizens" with a "postal sidewalk . . . constructed solely to provide for the passage of individuals engaged in postal business").

The physical characteristics of the airspace also underscore that it is not a public forum. The airspace is not, as the Center argues, an extension of the fora below, namely the beaches. We do not express any opinion as to whether the beaches are public fora because the record is not developed on this point and this categorization is not necessary to our analysis. But

even assuming that the beaches are public fora, the airspace above is not a public forum by extension.

Spatial proximity to a public forum is determinative only if the two areas are physically "indistinguishable." *See, e.g., United States v. Grace*, 461 U.S. 171, 179 (1983) (sidewalks leading to the United States Supreme Court building indistinguishable in both location and purpose from other public sidewalks and thus public fora). In *Kokinda*, the Supreme Court explained *Grace* as requiring the location and purpose of the property to be examined before it is deemed a public forum by proximity or extension. 497 U.S. at 728-29. Examining the location and purpose of the airspace surrounding the beaches of Honolulu, the airspace is easily distinguishable from the fora below. The airspace is physically separate from the ground or beaches, requires special equipment and authorization for access, and has never typically been a locus of expressive activity.

**[9]** Nor can the airspace be classified as a designated public forum, which is created only when the government has "expressly dedicated the property for expressive conduct." *Preminger*, 422 F.3d at 824 (citing *Widmar v. Vincent*, 454 U.S. 263, 267 (1981)). The regulated airspace is the antithesis of an "intentional[ ] opening [of] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. The Ordinance explicitly prohibits using Honolulu's airspace as a forum for expressive conduct and neither party cites a single example where expressive activity was sanctioned to occur in Honolulu's airspace. Further, Honolulu's airspace is not naturally compatible with expressive activity.

**[10]** We are thus left to examine the airspace as a nonpublic forum, in which the Ordinance does not violate the First Amendment as long as it is "(1) reasonable in light of the purpose served by the forum and (2) viewpoint neutral." *Brown*, 321 F.3d at 1222 (quotation marks omitted).

## B.    THE ORDINANCE IS VIEWPOINT NEUTRAL

[11] The Ordinance's prohibition against airborne signs or advertising devices is viewpoint free. "Viewpoint discrimination is a form of content discrimination in which 'the government targets not subject matter, but particular views taken by speakers on a subject.' " *Id.* at 1223 (citing *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 980 (9th Cir. 1998)). The Ordinance prohibits the "display in any manner or for any purpose whatsoever any sign or advertising device" by an "aircraft or other self-propelled or buoyant airborne object." The Ordinance says nothing about the content of the signs or the views expressed. In contrast to the laws at issue in other sign cases, the Ordinance makes no distinction between commercial signs and other displays. *See, e.g., Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 494-96 (1981). Nor does it distinguish between commercial speech or political speech. And, finally, the Ordinance draws no lines by subject matter (such as countenancing speech on behalf of candidates and yet restricting it on behalf of issue advocacy groups) or by viewpoint (such as distinguishing among views on abortion). In short, the prohibition is entirely neutral.

The only relevant exception to the absolute bar on advertising is that the Ordinance permits "an identifying mark, trade name, trade insignia, or trademark on the exterior of an aircraft. . . . if the displayed item is under the ownership or registration of the aircraft's or the airborne object's owner." § 40-6.1(b)(1). This exception, which pertains to the external marking of an aircraft, is a common sense one. Honolulu would be hard pressed to say that aircraft flying over the beach are prohibited from displaying their name and logo, such as Hawaiian Airlines, Aloha Airlines, Quantas Airlines, or United Airlines, when the FAA is charged with prescribing regulations for identification of aircraft. 49 U.S.C. § 40103(b)(2).

Despite the facial neutrality of the Ordinance, the Center argues that the Ordinance is not viewpoint neutral because it

discriminates between commercial advertising and political speech. Under the Ordinance, the Center argues, one could fly the Goodyear Blimp carrying a commercial message, yet would be prohibited from towing banners carrying the Center's political message. This argument mischaracterizes the Ordinance.

[12] It is true that once the government opens up a forum, it may not discriminate on the basis of viewpoint. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). But, the Ordinance does not do so. The identifying mark exception differentiates only as to the medium used for the expression— i.e., identifying marks on aircraft versus towed banners—and not on the basis of any particular viewpoint. For example, the district court posited that the Center could fly a blimp having its own identifying marks, even if its marks contained a political message:

> Plaintiffs complain that, under the wording of the statute, the Goodyear Blimp would be allowed to cruise the skies above Waikiki beach, while their tow-banners would not. This is not discrimination. If Plaintiffs so choose, they too would be permitted to purchase a dirigible or other aircraft, emblazon their own identifying mark on it, and fly above the beach.

*Center for Bio-Ethical Reform*, 345 F. Supp. 2d at 1137.

[13] Although the Center's hypothetical blimp would be limited to displaying an "identifying mark, trade name, trade insignia, or trademark" that is valid or permissible under the applicable FAA and trademark laws, the Center would nonetheless be as free as Goodyear to fly its own craft with identifying markings. Thus, to the extent permitted by federal law, and having nothing to do with the Ordinance, the Center could employ an "identifying mark" if it were "under the ownership or registration of the aircraft's or the airborne object's owner." § 40-6.1(b)(1). The result is that if the Center

has an aircraft or airline and an identifying mark, such as "Pro Life for America" or "Abortion Kills," it too could fly the aircraft over Honolulu's beaches without running afoul of the Ordinance. Of course such a scheme may be subject to federal restrictions that are not before us in this appeal. The Ordinance easily passes the hurdle of viewpoint neutrality.

## C.  THE ORDINANCE IS REASONABLE

[14] "The reasonableness analysis focuses on whether the limitation is consistent with preserving the property for the purpose to which it is dedicated." *Brown*, 321 F.3d at 1222 (quotation marks omitted). Any limitation must "fulfill a legitimate need[,] [y]et, in a nonpublic forum, the restriction need not constitute the least restrictive alternative available." *Preminger*, 422 F.3d at 824.

[15] It is well established that regulation for purposes of preserving aesthetics and promoting safety falls within the legitimate and substantial interests of local governments. *See e.g.*, *Metromedia*, 453 U.S. at 507-08 ("Nor can there be substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the appearance of the city—are substantial governmental goals."); *see also Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984) ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values."); *Ackerley Commc'ns of the N.W., Inc. v. Krochalis*, 108 F.3d 1095, 1099 (9th Cir. 1997) ("[T]he Court has continued to rely on its conclusion in *Metromedia* that a city's interest in avoiding visual clutter suffices to justify a prohibition of billboards . . . ."). The government need not provide detailed proof that the regulation advances its purported interests of safety and aesthetics. *Krochalis*, 108 F.3d at 1099-1100 ("As a matter of law Seattle's ordinance, enacted to further the city's interest in esthetics and safety, is a constitutional restriction on commercial speech without detailed proof that

the billboard regulation will in fact advance the city's interests.").

[16] The Ordinance fulfills several legitimate needs, including preserving the economically vital scenic beauty of Honolulu and minimizing traffic safety hazards for motorists and pedestrians. Although both of these goals are surely legitimate, preservation of the visual beauty of Honolulu's coastal and scenic areas is of paramount importance. The district court succinctly emphasized this point:

> To say that the ordinance is designed to mitigate "aesthetic harm" is misleading in Hawaii. In actuality, the ordinance is designed to protect what is perhaps the state's most valuable and fragile economic asset—the natural beauty upon which Hawaii's tourism economy relies. Revenue generated by tourism accounts for almost one quarter of Hawaii's gross domestic product, and almost one third of the state's employment. Studies, and common sense, indicate that the scenic beauty of Hawaii is one of the primary factors weighed by potential visitors when determining whether to spend their vacation dollars in Hawaii or another locale. More than half a billion dollars have been spent in the past five years on improvements to public areas in Waikiki, and a large proportion of these expenditures were for primarily aesthetic enhancements.

*Center for Bio-Ethical Reform*, 345 F. Supp. 2d at 1134.

These legitimate needs are also consistent with the purposes to which Honolulu has dedicated the airspace—aesthetic enhancement of the community and reduction of visual distractions for travelers on the ground.[4] Although the

---

[4]The airspace also has the obvious purpose of air travel, but this is an area which the FAA has plenary power to regulate. We therefore look only to the scope of purposes for which Honolulu has the ability to regulate.

legitimate needs and the purposes are congruent, it does not mean this inquiry is circular. Rather, it shows that, under the Ordinance, Honolulu has regulated the airspace to accomplish its legitimate purposes.

[17] The Center's suggestion that the Ordinance's identifying mark exception belies these purposes because aircraft painted with trademarks would certainly upset the aesthetics and produce visual distractions is both speculative and a non sequitur. Does the Center suggest that only an ordinance prohibiting all aircraft or all aircraft markings would be permissible? Honolulu's regulatory authority does not require it to exercise that power in a pristine, perfect sense, only in a reasonable manner. In other words, nothing requires Honolulu to turn the airspace into an air wilderness zone. Nor could it do so, given the FAA's plenary power over the airspace. Significantly, nothing in this record supports any claim that the Ordinance was aimed at the Center or its message. *See Taxpayers for Vincent*, 466 U.S. at 804 (prohibition of sign on public property upheld in part because "there is not even a hint of bias or censorship in the City's enactment or enforcement of this ordinance" and "[t]here is no claim that the ordinance was designed to suppress certain ideas that the City finds distasteful or that it has been applied to appellees because of the views that they express."). We conclude that the Ordinance is reasonable.

D. THE ORDINANCE DOES NOT FORECLOSE A TRADITIONALLY IMPORTANT MEDIUM OF COMMUNICATION OR LEAVE THE CENTER WITHOUT A PRACTICAL SUBSTITUTE

We consider one final point in our First Amendment analysis. Citing *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), the Center argues that the Ordinance violates the First Amendment because it forecloses an entire medium of communication, namely banner towing. We disagree.

In *One World One Family Now v. City and County of Honolulu*, 76 F.3d 1009 (9th Cir. 1996), we examined *Ladue*, and underscored several key aspects of the opinion that are of particular import to the present appeal. As we explained in *One World*:

> In *Ladue*, the Court struck down a broad ban on the display of signs on private residential property. The opinion rested heavily on the view that the city's ordinance closed off a "unique and important" mode of expression for which there is "no practical substitute." The Court explained that "[d]isplaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means."
>
> . . .
>
> A message on one's person or home has a unique effect because it "provide[s] information about the identity of the 'speaker' [which is] an important component of many attempts to persuade."

76 F.3d at 1015 (citations omitted).

*Ladue* was concerned with the elimination of "a common means of speaking," 512 U.S. at 55, that was "a distinct and traditionally important medium of expression," *id.* at 57 n.16, that had a unique ability to "provide information about the identity of the 'speaker,' " *id.* at 56, and that in light of these special attributes had "no practical substitute," *id.* at 57. Banner towing possesses none of these attributes.

[18] Banner towing is neither a common means of speaking nor a distinct and traditionally important form of expression. *Compare id.* at 55 (striking down ban on traditionally important residential signs and reciting cases protecting other tradi-

tionally important mediums such as distribution of pamphlets and handbills and door to door dissemination of literature) *with Lee*, 505 U.S. at 680 (holding that an airport is not a public forum in part because of "the lateness with which the modern air terminal has made its appearance" and the refusal of airport operators to intentionally open them to speech activity).

The Center does not argue, nor could it, that banner towing provides a unique ability to convey information about the speaker's identity. As observed by the district court, banner towing achieves the opposite result: "[*Ladue*] dealt with communication by an individual through means that tied the message to the speaker's identity. This [scenario] is precisely the opposite of what [the Center] seeks: a means by which to insulate itself from its unwilling audience." *Center for Bio-Ethical Reform*, 345 F. Supp. 2d at 1135.

Faced with these difficulties, the Center bases its argument almost entirely on the "no practical substitute" prong, arguing that the remaining modes of communication are inadequate because banner towing is uniquely efficient in expressing the Center's message to the large crowds gathered on the beaches of Honolulu. The Center misreads what is meant by "no practical substitute." *Ladue* teaches that in evaluating the adequacy of substitutes, the court must look to the unique communicative importance of the foreclosed medium in relation to the individual speaker. 512 U.S. at 56. For example, in *Ladue* the unique source identifying ability of a sign in front of an individual's home coupled with the fact that such signs are "unusually cheap and convenient" made other channels of communication unacceptable. *Id.* at 56-57. The Court distinguished how this analysis would differ if the speaker were a business or political organization:

> The precise location of many other kinds of signs (aside from "on-site" signs) is of lesser communicative importance. For example, assuming the audience

is similar, a commercial advertiser or campaign publicist is likely to be relatively indifferent between one sign site and another. The elimination of a cheap and handy medium of expression is especially apt to deter *individuals* from communicating their views to the public, for unlike businesses (and even political organizations)[,] individuals generally realize few tangible benefits from such communication.

*Id.* at 57 n.15. Unlike the yard signs in *Ladue*, banner towing does not have a unique source-identifying ability. Absent some unique source-identifying ability, the fact that banner towing is inexpensive and efficient, standing alone, does not mean the Ordinance is unconstitutional.

**[19]** The Supreme Court has already determined that there is no constitutional right to engage in the cheapest, easiest, or most far-reaching form of communication:

> That more people may be more easily and cheaply reached by [a particular means of communication], perhaps borrowed without cost from some zealous supporter, is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open.

*Kovacs v. Cooper*, 336 U.S. 77, 88-89 (1949). Even though the banner may be preferable in its communicative efficiency, there is little likelihood that the Center will be chilled in its efforts to spread its message to its intended audience through ample and adequate alternative channels. *See Ladue*, 512 U.S. at 56-57 & n.15. The Center has at its disposal a wide range of practical and effective means of communicating its message—from television to direct mail, email, leaflets, handheld signs and old-fashion stumping, Hyde Park style.

**[20]** We therefore hold that the Ordinance does not violate the First Amendment because it is a reasonable and

viewpoint-neutral restriction on speech in a nonpublic forum; as expressed in *Ladue*, the Ordinance does not foreclose a unique and traditionally important mode of expression for which there is no practical substitute.

## III.  THE ORDINANCE DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSE

[21] "[T]he viability of equal protection claims relating to expressive conduct is contingent upon the existence of a public forum. Only when rights of access associated with a public forum are improperly limited may we conclude that a fundamental right is impinged." *Monterey County Democratic Cent. Comm. v. U.S. Postal Serv.*, 812 F.2d 1194, 1200 (9th Cir. 1987) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54-55 (1983)). Because the airspace is a nonpublic forum, the Center has no claim to a fundamental right of access, and the Ordinance need only "rationally further a legitimate state purpose." *Id.* The Ordinance meets this minimal scrutiny, as we have already noted. We also emphasize that, consistent with the Equal Protection Clause, the Ordinance is viewpoint neutral and a reasonable restriction:

> [U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. . . . This is not to say that all [expressive conduct] must always be allowed. We have continually recognized that reasonable . . . regulations . . . may be necessary to further significant governmental interests. . . . [U]nder an equal protection analysis, there may be sufficient regulatory interests justifying selective exclusions or distinctions. . . .

*Mosley*, 408 U.S. at 96-98 (citations omitted). For these reasons, the Ordinance passes constitutional scrutiny.

## CONCLUSION

The district court properly granted Honolulu's motion for summary judgment. Federal law does not preempt the Ordinance. Nor does the Ordinance violate the First Amendment or the Equal Protection Clause of the Fourteenth Amendment. Honolulu's airspace is a nonpublic forum, and the Ordinance is reasonable, viewpoint neutral, and rationally related to legitimate governmental interests.

**AFFIRMED**.